**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1119

ANAS ELHADY; OSAMA HUSSEIN AHMED; AHMAD IBRAHIM AL
HALABI; MICHAEL EDMUND COLEMAN; MURAT FRLJUCKIE; ADNAN
KHALIL SHAOUT; WAEL HAKMEH; SALEEM ALI; SAMIR ANWAR; JOHN
DOE, No. 2; JOHN DOE, No. 3; SHAHIR ANWAR; BABY DOE, 2; YASEEN
KADURA; HASSAN SHIBLY; AUSAMA ELHUZAYEL; DONALD THOMAS;
IBRAHIM AWAD; MUHAMMAD YAHYA KHAN; HASSAN FARES; ZUHAIR
EL-SHWEHDI; JOHN DOE, No. 4; MARK AMRI,

          Plaintiffs – Appellees,

v.

CHARLES H. KABLE, Director of the Terrorist Screening Center, in his official
capacity; KELLI ANN BURRIESCI, Principal Deputy Director of the Terrorist
Screening Center in her official capacity; TIMOTHY P. GROH, Deputy Director for
Operations at the Terrorist Screening Center in his official capacity; DEBORAH
MOORE, Director of Department of Homeland Security Traveler Redress Inquiry
Program in her official capacity; NICHOLAS J. RASMUSSEN, Director of the
National Counterterrorism Center in his official capacity; DAVID PEKOSKE,
Administrator of the Transportation Security Administration in his official capacity;
CHRISTOPHER WRAY, Director of the Federal Bureau of Investigation in his
official capacity; KEVIN K. MCALEENAN, Acting Commissioner of United States
Customs and Border Protection in his official capacity,

          Defendants – Appellants,

------------------------------

THE RUTHERFORD INSTITUTE; CATO INSTITUTE; FRED T. KOREMATSU
CENTER FOR LAW & EQUALITY; FIREARMS POLICY COALITION, INC.;
FIREARMS POLICY FOUNDATION; JEFFREY KAHN; ELECTRONIC
FRONTIER FOUNDATION; MUSLIM ADVOCATES; AMERICAN CIVIL
LIBERTIES UNION; AMERICAN-ARAB ANTI-DISCRIMINATION

COMMITTEE; ARAB AMERICAN INSTITUTE; BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW; CENTER FOR CONSTITUTIONAL RIGHTS; CREATING LAW ENFORCEMENT ACCOUNTABILITY & RESPONSIBILITY PROJECT AT CITY UNIVERSITY OF NEW YORK; SIKH COALITION,

Amici Supporting Appellees.

———————————

**No. 20-1311**

———————————

ANAS ELHADY; OSAMA HUSSEIN AHMED; AHMAD IBRAHIM AL HALABI; MICHAEL EDMUND COLEMAN; MURAT FRLJUCKIE; ADNAN KHALIL SHAOUT; WAEL HAKMEH; SALEEM ALI; SAMIR ANWAR; JOHN DOE, No. 2; JOHN DOE, No. 3; SHAHIR ANWAR; BABY DOE, 2; YASEEN KADURA; HASSAN SHIBLY; AUSAMA ELHUZAYEL; DONALD THOMAS; IBRAHIM AWAD; MUHAMMAD YAHYA KHAN; HASSAN FARES; ZUHAIR EL-SHWEHDI; JOHN DOE, No. 4; MARK AMRI,

Plaintiffs – Appellees,

v.

CHARLES H. KABLE, IV, Director of the Terrorist Screening Center, in his official capacity; KELLI ANN BURRIESCI, Principal Deputy Director of the Terrorist Screening Center in her official capacity; TIMOTHY P. GROH, Deputy Director for Operations at the Terrorist Screening Center in his official capacity; DEBORAH MOORE, Director of Department of Homeland Security Traveler Redress Inquiry Program in her official capacity; NICHOLAS J. RASMUSSEN, Director of the National Counterterrorism Center in his official capacity; DAVID P. PEKOSKE, Administrator of the Transportation Security Administration in his official capacity; CHRISTOPHER ASHER WRAY, Director of the Federal Bureau of Investigation in his official capacity; KEVIN K. MCALEENAN, Acting Commissioner of United States Customs and Border Protection in his official capacity,

Defendants – Appellants,

------------------------------

THE RUTHERFORD INSTITUTE; CATO INSTITUTE; FRED T. KOREMATSU CENTER FOR LAW & EQUALITY; FIREARMS POLICY COALITION, INC.; FIREARMS POLICY FOUNDATION; JEFFREY KAHN; ELECTRONIC FRONTIER FOUNDATION; MUSLIM ADVOCATES; AMERICAN CIVIL LIBERTIES UNION; AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE; ARAB AMERICAN INSTITUTE; BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW; CENTER FOR CONSTITUTIONAL RIGHTS; CREATING LAW ENFORCEMENT ACCOUNTABILITY & RESPONSIBILITY PROJECT AT CITY UNIVERSITY OF NEW YORK; SIKH COALITION,

   Amici Supporting Appellees.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, District Judge.  (1:16-cv-00375-AJT-JFA)

---

Argued:  January 26, 2021         Decided:  March 30, 2021

---

Before WILKINSON, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Richardson and Judge Quattlebaum joined.

---

**ARGUED:**  Joshua Paul Waldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Gadeir Ibrahim Abbas, CAIR LEGAL DEFENSE FUND, Washington, D.C., for Appellees.  **ON BRIEF:**  Joseph H. Hunt, Assistant Attorney General, G. Zachary Terwilliger, United States Attorney, Sharon Swingle, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Lena F. Masri, Justin Sadowsky, CAIR LEGAL DEFENSE FUND, Washington, D.C., for Appellees.  John W. Whitehead, Douglas R. McKusick, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia; Ilya Shapiro, Clark M. Neily III, CATO INSTITUTE, Washington, D.C.; Bradley D. Jones, Nicole P. Desbois, ODIN, FELDMAN & PITTLEMAN, P.C., Reston, Virginia, for Amici The Rutherford Institute and Cato Institute.  Robert S. Chang, Jessica Levin, Fred T. Korematsu Center for Law and Equality, Ronald A. Peterson Law Clinic, SEATTLE UNIVERSITY SCHOOL OF LAW, Seattle, Washington; Muhammad U. Faridi, Sofia G. Syed, Andrew Willinger, PATTERSON BELKNAP WEBB & TYLER LLP, New York, New York, for Amicus The Fred T. Korematsu Center for Law and Equality.  Matthew Larosiere, FIREARMS

POLICY COALITION, Sacramento, California; Reilly Stephens, Alexandria, Virginia, for Amici Firearms Policy Coalition and Firearms Policy Foundation.  Patrick Toomey, Noor Zafar, Hina Shamsi, Hugh Handeyside, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici American Civil Liberties Union, American-Arab Anti-Discrimination Committee, Arab American Institute, Brennan Center for Justice, Center for Constitutional Rights, Creating Law Enforcement Accountability & Responsibility Project, and the Sikh Coalition.  Andrew T. Tutt, R. Stanton Jones, Stephen K. Wirth, Shira V. Anderson, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Amicus Professor Jeffrey D. Kahn.  Matthew W. Callahan, MUSLIM ADVOCATES, Washington, D.C., for Amicus Muslim Advocates.  Matthew Borden, Athul Acharya, Gunnar Martz, BRAUNHAGEY & BORDEN LLP, San Francisco, California; Saira Hussain, Mark Rumold, Kit Walsh, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California, for Amicus Electronic Frontier Foundation.

WILKINSON, Circuit Judge:

To protect against acts of terrorism, the government maintains the Terrorist Screening Database (TSDB). One of the chief uses of the TSDB is to screen travelers in airports and at the border. The plaintiffs, twenty-three individuals who allege they are in the TSDB, object to the delays and inconveniences they have experienced in airports and at the border. They allege the TSDB program violates the Fifth Amendment's Due Process Clause by failing to include more procedural safeguards.

The term "national security" is too often bandied loosely and carelessly about, but this is no program of marginal consequence. It lies at the very heart of our country's effort to identify those who would inflict upon the public irretrievable loss and irreparable mass harms. By bringing this across-the-board attack on a system vital to public safety—rather than more focused individual challenges to particular law enforcement actions—plaintiffs face a demanding legal standard. Procedural due process claims require showing that the government violated constitutionally protected liberty interests. Plaintiffs cannot meet that burden. The government has had authority to regulate travel and control the border since the beginning of the nation. Indeed, this authority is a core attribute of sovereignty. The delays and burdens experienced by plaintiffs at the border and in airports, although regrettable, do not mandate a complete overhaul of the TSDB.

Nor are plaintiffs' alleged reputational injuries more persuasive. The government has not publicly disclosed their TSDB status, the inconveniences protested reflect no singular disapprobation, and plaintiffs have not demonstrated the loss of any legal rights due to their alleged TSDB inclusion.

5

This by no means places the TSDB program above the law. Individual applications of the program may run afoul of recognized legal prohibitions and thus remain subject to judicial review. But any wholesale reworking or significant modification of the program rests within the purview of the democratic branches. Two of our sister courts of appeals reached the same conclusions in similar challenges to the TSDB. *See Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019); *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017). We find these decisions persuasive and decline the invitation to create a circuit split. We therefore reverse the district court's conclusion to the contrary and remand with instructions to enter judgment in favor of the government.

## I.

## A.

The rise of international terrorism in the twenty-first century pushed the government to establish a national security apparatus to combat it. Created by executive order, the TSDB is the federal government's consolidated watchlist of known or suspected terrorists. The TSDB is maintained by the Terrorist Screening Center (TSC), a multi-agency center administered by the FBI. The FBI and TSC work in coordination with the National Counterterrorism Center and the Department of Homeland Security (DHS) and its components, including the Transportation Security Administration (TSA) and U.S. Customs and Border Protection (CBP).

There are 1,160,000 individuals in the TSDB, but only about 4,600 of them are U.S. citizens. J.A. 378. Individuals enter the TSDB through nomination, usually by a federal law enforcement agency. Before an individual is placed in the TSDB, a multi-step process

6

is followed that includes review by TSC staff. The nomination must rely upon "articulable intelligence or information" which "creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." J.A. 380–81. TSC considers a broad variety of factors in deciding whether to add someone to the list, including an individual's travel history, associates, business associations, international connections, financial transactions, and ethnic or religious affiliations. TSC receives around 113,000 nominations annually and around 99% are accepted.

One of the most significant uses for the TSDB is in airports by the TSA, which relies on it to screen airline passengers. For purposes of air travel, the TSDB's entries are organized into important subcategories. The No Fly List is the most restrictive category; individuals in that category are prohibited from boarding commercial flights on U.S. carriers and flights through U.S. airspace. J.A. 378. Individuals on the Selectee List, by contrast, are permitted to board commercial flights after undergoing enhanced screening. J.A. 321. The TSA may also designate passengers for enhanced screening who meet the reasonable suspicion standard for TSDB inclusion and for whom the TSDB record contains a full name and date of birth. This is known as the "Expanded Selectee List." Individuals on the Expanded Selectee List are subject to the same enhanced screening as those on the Selectee List. J.A. 324 n.15. The difference between the Selectee List and the Expanded Selectee List is that the former requires "additional substantive derogatory criteria." J.A. 324 n. 15, 378 n.5.

7

An individual's airport experience differs depending on his status in the TSDB. As explained by the Executive Director for Vetting in the TSA's Office of Intelligence and Analysis, all individuals traveling through an airport are subject to standard screening, which includes examining luggage with a scanner and screening individuals with a walk-through metal detector, Advanced Imaging Technology machine, or a pat-down. J.A. 324–25 n.16, 331, 333. Individuals on the TSDB's Selectee or Expanded Selectee Lists are subject to enhanced screening, as are other passengers chosen randomly or for other reasons by the TSA. Enhanced screening is a relatively common experience for frequent airport travelers because the TSA will often randomly select people for this screening. Further, most passengers chosen for enhanced screening are not in the TSDB. J.A. 330–31. During enhanced screening, agents again search the person, screen the individual's property with explosives trace detection, physically investigate the inside of any luggage, and examine the individual's electronics (to ensure they can be powered on) and footwear. J.A. 333–34 n.27. A typical enhanced screening takes ten to fifteen minutes, though it can take longer. J.A. 334. TSA is also authorized to require additional screening of all passengers at the gate. J.A. 325.

Another major user of the TSDB is the CBP, which employs it to vet people entering at ports of entry on both land and sea borders. All travelers must present themselves to a CBP officer, who vets them and may check their luggage to ensure compliance with customs laws. J.A. 411. Based on the totality of the circumstances, CBP officers have broad discretion to require travelers to go through secondary inspection. The length of this inspection varies depending on the individual, whether the person is at an airport or border

8

location, and the nature of the CBP's suspicion. J.A. 413–15. The CBP's digital law enforcement system alerts officers if a screened individual is in the TSDB. J.A. 413–14. Although CBP agents do not have a formal policy of subjecting TSDB members to secondary inspection, common sense suggests that travelers included in the TSDB are more likely to be chosen.

The TSC makes the TSDB available to federal law enforcement agencies, state and tribal law enforcement agencies, some foreign governments, and some private companies working in sensitive security areas, like airlines and nuclear facilities. J.A. 379–80. When an entity accesses the TSDB, it does not view classified information or the reasons a person was placed in the database. It contains only the biographical and biometric information necessary to allow individuals to be identified. J.A. 377.

The government has adopted policies designed to prevent erroneous placements in the TSDB. Each nominating agency must have internal procedures to prevent errors in its nominations and must annually review its nominations of all U.S. persons (citizens and lawful permanent residents) to the TSDB. J.A. 386. TSC also conducts a biannual review of all U.S. persons in the TSDB to ensure that the underlying information still supports the nomination and performs audits to confirm that its data is accurate and current. J.A. 387.

But Congress made the determination that additional procedural safeguards were needed. Congress directed DHS to develop a post-inclusion redress process for travelers who believe they have been delayed or prohibited from boarding a commercial aircraft because they have been wrongly identified as a threat. *See* 49 U.S.C. § 44926(a), (b)(1); 49 U.S.C. §§ 44903(j)(2)(C)(iii)(I), (j)(2)(G)(i). TSA administers the DHS Traveler Redress

9

Inquiry Program (DHS TRIP), through which individuals may request redress if they experienced travel-related difficulties at an airport or port of entry. 49 C.F.R. §§ 1560.3, 1560.205. DHS TRIP receives approximately 15,000 completed inquiries annually, 98% of which have no connection to any identity in the TSDB. J.A. 389. If an individual is in the TSDB, the government reviews the information it relied upon in initially labeling that person and any new information to reassess whether that person belongs in the TSDB. About thirty-five full-time employees handle these reviews. At the conclusion of the process, DHS TRIP sends the traveler a letter with the result of the inquiry. However, the government does not disclose whether the petitioner was actually in the TSDB.

In fact, the government has a general policy of not disclosing TSDB status, whether positive or negative, in response to inquiries. J.A. 391. The reason for this is apparent. Disclosure would disrupt and potentially destroy counterterrorism investigations because terrorists could alter their behavior, avoid detection, and destroy evidence. J.A. 364–66. For example, if a terrorist group knew that some of its operatives were *not* in the TSDB, it could craft a plan sending those operatives through an airport or border while helping other members avoid detection. J.A. 339, 415–16. For similar reasons, the government will not publicly disclose how an individual came to be included. Doing so could alert terrorists to the tactics used by the government to detect them.

B.

Plaintiffs are twenty-three individuals who allege they are in the TSDB and have suffered various negative consequences as a result. They allege they are on the Selectee List or Expanded Selectee List. The government has not confirmed whether the plaintiffs

10

are actually in the TSDB. Because no plaintiff has been fully barred from flying, it is fair to assume that no plaintiff is on the No Fly List, and the plaintiffs do not allege they are on this list. For purposes of this case, we will assume that at least some of the plaintiffs are in the TSDB. They allege a variety of harms, with most occurring in airports or at the border.

In airports, some of the plaintiffs allege harms ranging from relatively mundane delays to major inconveniences and negative experiences. Hassan Shibly, for example, alleges he has routinely been pulled aside for enhanced screening at airports. J.A. 537–40, 543, 547–50. One time, when traveling with family, he was placed in handcuffs when detained for enhanced screening, causing his grandmother to become very upset. J.A. 537–38. Zuhair El-Schwehdi says he has also been repeatedly pulled aside for enhanced screenings, causing him to miss multiple connecting flights. J.A. 594–97. He alleges he now avoids flying whenever possible to avoid harassment. Every year, he and his family drive from Ohio to Atlanta, rather than flying. J.A. 595–96. He also claims enhanced screening caused him to miss his brother's funeral in Libya. J.A. 599–600. The length of delays pleaded by plaintiffs due to these screenings varied substantially but was generally close to one hour.[1] Many of the plaintiffs have also regularly traveled without any unusual delays or incidents.

---

[1] The delays alleged by plaintiffs were: Ahmad Al Halabi (30 to 45 minutes), J.A. 276–77, Samir Anwar (15 minutes), J.A. 279, Michael Coleman (30-60 minutes), J.A. 281, Anas Elhady (1 hour), J.A. 284, Zuhair El-Shwehdi (30 to 45 minutes at check-in, 20 to 30 minutes security screening), J.A. 285, Hassan Fares (10 minutes), J.A. 286, Hassan Shibly (15 to 20 minutes, 45 minutes at the longest), J.A. 291, Muhammad Khan (30 minutes to 3 hours, returning on international trip), J.A. 289, and Donald Thomas (1 to 2 hours), J.A. 291.

At the borders, the experience of some plaintiffs has been similar. They allege delays and detentions ranging from a few minutes to twelve hours, with most being on the shorter side of that range.[2] A few of these detentions, however, involved what were alleged to be more extreme circumstances. When Anas Elhady tried to cross the border, he claims he was ordered out of his car, handcuffed, and placed in a very cold room without shoes or a jacket. He was interrogated for several hours about family and friends before eventually passing out from the cold. J.A. 495–97. Ahmad Halabi was arrested, placed in handcuffs, and detained for several hours in a cold room at the northern border. J.A. 522–23. Murat Frljuckic says he has been arrested at gunpoint repeatedly by CBP agents. J.A. 563–72. Yaseen Kadura's phone was seized twice during border searches and FBI agents tried to convince him to work for them. J.A. 514. Most plaintiffs have crossed the border or traveled internationally without unusual delays or incidents a fair percentage of the time.

The plaintiffs allege additional consequences attendant to TSDB status. First, they allege that inclusion disadvantages them and family members during visa applications,

---

[2] The delays alleged by plaintiffs at land borders or upon return from foreign countries in airports were: Saleem Ali (30 to 45 minutes, 3 hours, and 6 hours), J.A. 277, Ibrahim Awad (15 minutes on one occasion, less than 1 hour on several others), J.A. 280, John Doe 4 (30 minute delay when departing, but no delay when returning), J.A. 283, Anas Elhady (30 minutes, 1 hour, 2 hours, 4 hours, 12 hours), J.A. 284, Hassan Fares (10 to 15 minutes, 1-2 hours), J.A. 286, Hassan Shibly (15 to 30 minutes, 2 hours, 6 hours), J.A. 291, Ahmad Al Halabi (4 to 5 hours), J.A. 276–77, Samir Anwar (3.5 hours), J.A. 279, Shahir Anwar (2 to 3 hours), J.A. 279-80, Michael Coleman (1-2 hours), J.A. 281-82, John Doe 2 (1-3 hours), J.A. 282–83, John Doe 3 (5.5 hours), J.A. 282–83, Ausama Elhuzayel (3 hours), J.A. 285, Zuhair El-Shwehdi (usually 2 hours, once 6 hours), J.A. 285 Murat Frljuckic (3.5 to 4 hours and 6 hours), J.A. 287, Wael Hakmeh (1 to 2 hours), J.A. 287–88, Adnan Khalil Shaout (30 minutes to 3 hours), J.A. 290, and Yaseen Kadura (1 hour, 7 to 8 hours), J.A. 288.

causing lengthy delays. Second, they allege it is harder for them to get employment with various government agencies and private entities working in national security areas, like the Department of State or nuclear power plants. Finally, plaintiffs allege it is harder for them to acquire various types of licenses and firearms because the FBI uses the TSDB in conducting background checks. The FBI imposes a mandatory three-day waiting period for individuals in the TSDB, and at least one state, New Jersey, bars TSDB individuals from buying guns. Eighteen plaintiffs filed DHS TRIP inquiries and received final responses from the government. Five plaintiffs did not file a DHS TRIP inquiry.[3]

As can be expected, the parties frame the facts differently. The plaintiffs describe a large number of alleged incidents, of which the above are but illustrative. The defendants argue we should focus on the typical experience of the plaintiffs, not on their more dramatic allegations. The fact is that plaintiffs have brought before the court a set of widely varying circumstances. This makes sense from their perspective because they seek a remedy that far transcends any individual plaintiff's plight. But facial challenges have their drawbacks. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (explaining that "[f]acial challenges are disfavored" because they "often rest on speculation," violate principles of "judicial restraint," and "threaten to short circuit the democratic process" by empowering judges over the people's representatives). By taking

---

[3] Because we conclude that judgment should be entered in favor of the government on a basis that covers all plaintiffs, we do not reach the government's argument that plaintiffs were required to exhaust their DHS TRIP remedy before suing.

a roundhouse swing at the TSDB program, plaintiffs have raised the bar they must clear in order to prevail.

In fact, there are multiple reasons why we cannot accept plaintiffs' invitation to have our decision turn on the most dramatic incidents to which they point. When considering a facial challenge such as this one, we note that programs can withstand such facial attacks whenever they are capable of constitutional applications. *See United States v. Salerno*. 481 U.S. 739, 745 (1987). Moreover, the Supreme Court has directed that the due process inquiry and mandated procedures must be directed at the "generality of cases, not the rare exceptions." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976); *see also Ingraham v. Wright*, 430 U.S. 651, 677–78, 682 (1977) (rejecting a due process claim brought by two students who were subject to severe corporal punishment at school). In short, the Supreme Court has recognized that facial challenges will often present, as here, a plethora of differing individual circumstances, and that adopting the most extreme allegations for a holding of facial invalidity would encourage facial attacks on all manner of programs and initiatives with all of their attendant anti-democratic consequences. Thus whether the inquiry is framed as looking to the average delay or whether the program is capable of constitutional applications, we are simply not permitted by the Supreme Court to give dispositive weight to outlier experiences.

C.

The plaintiffs have brought suit seeking declaratory and injunctive relief via substantive due process, equal protection, the Administrative Procedure Act (APA), and procedural due process claims. *See Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019).

14

The district court dismissed the substantive due process and equal protection claims. *Id.* at 567. Equating the APA and procedural due process claims, which alleged that plaintiffs were not given notice of their TSDB status nor a meaningful opportunity to refute the information on which the status was based, the district court granted summary judgment in favor of the plaintiffs. *Id.* at 574.[4] It also rejected the government's cross-motion for summary judgment.

The court found violations of plaintiffs' protected liberty interests under the Due Process Clause on two theories. *Id.* at 577–80. First, it found the TSDB harmed plaintiffs' "movement-related interests" by deterring their travel and by burdening their travel through extra screening and searches. *Id.* at 577. Second, it reasoned that the TSDB implicated plaintiffs' reputational liberty interests under a "stigma-plus" theory. *Id.* at 579–80. According to the district court, the TSDB stigmatized plaintiffs by labeling them as known or suspected terrorists, and the government then disseminated that TSDB information in various ways. *Id.* That dissemination could be expected, it asserted, to affect an individual with respect to "traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Id.* at 580.

Moving to the second stage of the procedural due process inquiry, the district court held that the existing DHS TRIP procedures did not satisfy due process. It reasoned that

---

[4] The APA claims are given almost no discussion by the parties on appeal, following the lead of the district court in conflating the due process and APA claims and assuming that the APA claims rose or fell with the due process contentions. For the purpose of this appeal, we will follow the lead of the parties and district court as well.

15

the risk of erroneous deprivation was high because individuals were not told whether they were in the TSDB or provided with the information upon which their status might be based; there was no independent review of TSDB status by a neutral decisionmaker; and the government's standards for inclusion in the TSDB were vague. *Id.* at 580–82. The court acknowledged that the government had a compelling interest in preventing terrorist attacks and in maintaining secrecy over the underlying intelligence. It thus concluded that such interests precluded any claim to pre-deprivation notice. *Id.* at 583. But the court held plaintiffs were entitled to post-deprivation process and that the current DHS TRIP procedures were inadequate. *Id.* at 583–84.

Subsequently, the district court ordered the government to "promptly review the listing of any named Plaintiff currently listed in the TSDB according to additional procedures to be added to a revised DHS TRIP process," to "disclose those revised procedures to the Court for its review as to their constitutional adequacy," and to "disclose . . . to the Court . . . the status of the named Plaintiffs with respect to any TSDB listing after a review under those revised procedures." J.A. 180–181. The district court also requested supplemental briefing on the proper remedy. It asked the parties to address whether the court should extend the procedures ordered in *Latif v. Holder*, where a district court directed a comprehensive written explanation, subject to judicial review, of any decision to place an individual on the No Fly List. *See* 28 F. Supp. 1134, 1162 (D. Ore. 2014).

Before the district court could proceed to consider further remedial action, this court granted the government's petition for permission to appeal under 28 U.S.C. § 1292(b).

16

## II.

We review *de novo* the district court's grant of summary judgment in favor of plaintiffs' procedural due process claims. *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The Fifth Amendment's Due Process Clause prohibits the government from taking an individual's "life, liberty, or property without due process of law." U.S. Const. amend. V. These words mean that the government may not take certain actions without providing procedural protections meant to prevent erroneous decisions. *See, e.g., Londoner v. Denver*, 210 U.S. 373, 385-86 (1908).

But not every government action creates a constitutional question over what procedures are required. The Supreme Court has explained that a procedural due process claim must demonstrate a substantial infringement of liberty or property in order to proceed. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (1972) ("[T]he range of interests protected by procedural due process is not infinite."). No process is due otherwise. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). In this case, plaintiffs allege violations of constitutionally protected liberty interests.

The Supreme Court has made clear that the range of constitutionally protected liberty interests is circumscribed. The interest must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed." *Kerry v. Din*, 576 U.S. 86, 94 (2015) (plurality opinion) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). History is the essential guidepost in this area. After all, the Due Process Clause has an ancient lineage, descending from Magna Carta. *Id.* at 91. Using history as its touchstone,

the Supreme Court has explained that liberty encompasses "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Roth*, 408 U.S. at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1926)). But history works both ways. If there is a historical tradition of "denying the specific application" of a liberty right, the right "must give way." *Din*, 576 U.S. at 95.

A.

1.

Plaintiffs allege infringement of two liberty interests in this case. First the plaintiffs argue that inclusion in TSDB infringes their right to travel. This right's lineage is ancient. Blackstone explained that Magna Carta guaranteed the "power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint." 1 William Blackstone, Commentaries on the Laws of England *134 (1769). And as American jurists have long recognized, the right to travel is protected by the Constitution because it is necessary to exercise other rights, including assembly, journeying to "the seat of government to assert any claim [one] may have upon that government," or accessing the courts. *Slaughter-House Cases*, 83 U.S. 36, 79 (1872) (quoting *Crandall v. Nevada*, 73 U.S. 35, 44 (1867)). The *Slaughter-House* cases located the right to travel in the Fourteenth Amendment's Privileges or Immunities Clause. The Supreme Court has subsequently relied on multiple provisions, including the Due Process

18

Clause, as a source of this right. *See, e.g.*, *Cramer v. Skinner*, 931 F.2d 1020, 1029-30 (5th Cir. 1991) (discussing the possible constitutional provisions that support this right's existence).

In examining the right, some precision is required. It is important to start by carefully framing plaintiffs' asserted liberty interest. It cannot be framed too broadly because the Supreme Court requires a "careful description of the asserted fundamental liberty interest" when assessing whether a procedural due process right is implicated. *Kerry*, 576 U.S. at 93 (quoting *Glucksberg*, 521 U.S. at 720–21). Plaintiffs do not allege a *per se* ban on domestic or international travel. Nor can they, because plaintiffs are not on the No Fly List and have been able to routinely board planes and cross the border. Plaintiffs can only claim that they are subject to enhanced screening in airports before boarding flights, and that is the only real barrier to domestic travel imposed by their possible presence on the Selectee or Expanded Selectee lists. Aside from complaints about delays in airports, they do not allege any obstruction of their ability to travel domestically by means other than planes, like trains and automobiles. The screening burdens on international travel are similar, albeit enhanced by longer delays upon arriving back in the United States.

Moreover, history reveals that the government has long had the ability to impose some regulations and delays on travel by citizens, particularly international travel. Although Magna Carta recognized the right of "any person, for the future, to go out of our kingdom, and to return, safely and securely, by land or water," it qualified that right by making clear it must be done "according to the laws of the land." Magna Carta ch. 42. That

qualification clearly passed into American law. From the beginning of the nation, the government has regulated international travel, employing officers to enforce various rules at borders and ports of entry. *See United States v. Ramsey*, 431 U.S. 606, 616-17 (1977) (discussing how the first Congress passed a law granting officers broad powers to search ships and enforce customs laws); *see also* The Federalist No. 12, at 89 (Clinton Rossiter ed., 1961) (Alexander Hamilton) (discussing the need for the federal government to establish "rigorous precautions by which the European nations guard the avenues into their respective countries, as well by land as by water"). Even internally, the Constitution allowed for inspection laws that would place some burdens on domestic travel. *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196-97 (1824) (discussing the power of Congress to license and regulate navigation in the nation's internal waterways).

Security inspections and rules have thus burdened travelers from the beginning of the country. *See* The Federalist No. 12, *supra* at 89 (Alexander Hamilton) ("A few armed vessels, judiciously stationed at the entrances of our ports, might at small expense be made useful sentinels of our laws."). So too did quarantines imposed on travelers suspected of carrying infectious diseases. *See, e.g.*, *The Passenger Cases*, 48 U.S. (7 How.) 283, 484 (1849) (Taney, C.J., dissenting) ("[I]f the ship comes from a port where a contagious disease is supposed to exist, she is always placed under quarantine, and subjected to the delay and expenses incident to that condition, and neither the crew nor cargo suffered to land until the State authorities are satisfied that it may be done without danger."). The government has also regulated international travel through the issuance of passports, making them mandatory for certain periods as early as the War of 1812. *See Haig v. Agee*,

20

453 U.S. 280, 293 n.22 (1981) (discussing the history of passports and explaining that they were not always required in peacetime until 1978). And although air travel is a more recent phenomenon, the government has long regulated airport travel with security rules and requirements. *See, e.g.*, *Int'l Soc'y for Krishna Consciousness*, *Inc. v. Lee*, 505 U.S. 672, 681-82 (1992) (discussing the "security magnet" and use of restricted areas in airports).

What history suggests, precedent confirms: the right to travel is qualified, not absolute. Neither plaintiffs nor anyone else have a constitutionally protected interest in being able to travel domestically or internationally without incurring some burdens. *See Agee*, 453 U.S. at 305 ("[T]he freedom to travel abroad . . . is subject to reasonable governmental regulation."); *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) (stating that the Constitution requires that "all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which *unreasonably* burden or restrict this movement." (emphasis added)). The right to travel is not violated by "minor burdens," *Miller* v. *Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999), or "[m]inor restrictions," *Cramer*, 931 F.2d at 1031.

The experiences alleged by plaintiffs do not rise to the level of constitutional concern. Most plaintiffs complain of minor delays in airports of an hour or less. These burdens are not dissimilar from what many travelers routinely face, whether in standard or enhanced screenings, particularly at busy airports. After all, most travelers who face lengthier enhanced screenings are not in the TSDB but are instead chosen randomly. Plaintiffs cite a few instances where the delays took up to three hours, but those are atypical. Indeed, the record does not support plaintiffs' assertions that they were all routinely subject

21

to such enhanced scrutiny. Michael Coleman, for example, traveled five times by air domestically and four times internationally between September 2017 and February 2018, but he experienced problems on only three of those trips. J.A. 281. During the following year, Coleman experienced no delays on his five domestic and two international trips. J.A. 281. John Doe 2 never encountered enhanced screenings on more than twenty domestic flights between 2000 and 2018. J.A. 282. Anas Elhady took three roundtrip domestic flights between 2013 and 2018, experiencing delays on none of them. J.A. 284. Wael Hakmeh was subjected to secondary inspection on only two of ten international trips and enhanced screening on only one of five domestic flights. J.A. 287–288. Yasseen Kadura flew without incident on at least four domestic round-trip flights since 2016. J.A. 289. As for plaintiffs' complaints that airport security caused some missed flights, that misfortune is regrettably shared with many travelers not in the TSDB but selected for enhanced screening. In short, plaintiffs' allegations boil down to an asserted constitutional right to convenient travel. But as any experienced airport traveler knows, that wish finds little support in reality.

Plaintiffs also argue that, aside from the objective burdens that TSDB status imposes on their right to travel, they have *subjectively* been deterred from traveling by the inconveniences and humiliations experienced in airports. *See, e.g.*, J.A. 448, 456, 459. For example, plaintiff El-Schwehdi alleges that because enhanced screenings have caused him to miss multiple flights, he now drives from Ohio to Atlanta every year instead of flying in order to avoid harassment. *See* J.A. 457. Plaintiffs argue this evidence is enough to find that their right to travel has been infringed, relying on Justice Brennan's plurality opinion

22

in *New York. v. Soto-Lopez,* 476 U.S. 898 (1986), which stated that "[a] state law implicates the right to travel when it actually deters such travel." *Id.* at 903.

As an initial matter, we doubt that due process is implicated by mere *subjective* deterrence. We do not understand the majority of the Supreme Court to have adopted anything like a subjective standard for measuring travel burdens. Lower courts have consistently declined to adopt plaintiffs' interpretation, preferring an objective analysis over a subjective one. *See, e.g., Pollack v. Duff*, 793 F.3d 34, 45 (D.C. Cir. 2015) (remarking that if a law's "effect upon [a plaintiff's] willingness to travel, *i.e.*, to exercise her right to travel, is negligible[,] [it] does not warrant scrutiny under the Constitution" (internal quotation marks omitted)); *Torraco v. Port Auth. of New York and New Jersey*, 615 F.3d 129, 141 (2d Cir. 2010) ("Assuming that the actions the defendants took did in fact deter these plaintiffs . . . the most-inconvenienced plaintiff was delayed a little over one day. This was a minor restriction that did not result in a denial of the right to travel."). This is consistent with the general preference of constitutional law for objective inquiries over subjective ones. *See, e.g., Whren v. United States*, 517 U.S. 806, 813–14 (1996). Such objective inquiries spare courts the practical difficulties of assessing the sincerity and idiosyncrasies of individual litigants.

But even if we accepted plaintiffs' assertions that these inconveniences have actually deterred them from flying, our analysis would stand firm. Many courts have held that individuals do not have a protected liberty interest to travel via a particular mode of transportation. *See, e.g., Miller*, 176 F.3d at 1205 (holding that "burdens on a single mode of transportation do not implicate the right to interstate travel"). Plaintiffs can travel

23

domestically without interference by train or automobile. Plaintiffs can travel internationally by boat or by taking some later flight. No plaintiff alleges he is unable to get to a particular destination because of the TSDB. That is decisive. Although our law may guarantee the citizen's right to travel, it is less attentive to how he gets there.

The Sixth and Tenth Circuits recognized this reality in finding no protected liberty interest in similar cases. In *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017), the Sixth Circuit rejected a procedural due process claim by two U.S. citizens who alleged they were included on the Selectee List. Like the allegations here, the plaintiffs in *Beydoun* asserted that they missed many flights "after being subjected to lengthy secondary screenings," citing "delays ranging from ten minutes to one hour in duration," and argued that they "had been deterred from flying on one occasion." *Id.* at 467–68. In response, the court held that "[p]laintiffs did not allege that any protected interest was violated by the[ir] being on the Selectee List." It acknowledged that "[p]laintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane," but concluded that these burdens did not amount to a constitutional violation because "[p]laintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane."

Similarly, in *Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019), the Tenth Circuit held that a U.S. citizen's procedural due process challenge to his inclusion on the Selectee List failed because he lacked a constitutional liberty interest in traveling without being subject to delays. The plaintiff alleged he had been "subject to extended security screenings each time he travel[ed] by air," "secondary inspections, questioning, and prolonged searches of his person and luggage," and having "TSA agents shut down an entire screening line and

24

requir[ing him] to proceed through the line by himself." *Id.* at 1023. The plaintiff presented one delay of "about a half hour" and another of 48 hours. *Id.* at 1023–26. The court rejected the plaintiff's argument because "the burdens and delays alleged by [the plaintiff did] not substantially interfere with his travel rights." *Id.* at 1030. The plaintiff's "placement on the Selectee List affect[ed] only one mode of transportation throughout the country" and his longest asserted delay was "for just two days," which was "commensurate" with those in other cases where courts had rejected similar challenges. *Id.* at 1030–31. In summary, the court concluded that "[d]elays of a few hours are not uncommon for many air travelers and do not amount to a substantial interference with the rights to travel interstate or internationally." *Id* at 1031.

*Beydoun* and *Abdi* provide persuasive guidance on the resolution of this case. Both courts recognized the analysis should focus on the *average* delay caused by enhanced screening instead of focusing on outliers, like the two-day delay in *Abdi*. 942 F.3d at 1032. Here, the typical delay pleaded by plaintiffs is around an hour or less. And as *Beydoun* observed, TSDB status affects only air travel, leaving alternative modes of travel like automobiles and trains available. 871 F.3d at 468. We find the reasoning in these cases to be sound and thus again decline plaintiffs' invitation to create a circuit split.

2.

History and practical reality reveal that plaintiffs' claims with respect to additional screenings when crossing national borders are even less persuasive. As with the experiences faced in airports, secondary inspection at the border has not prevented plaintiffs from entering or exiting the United States. Rather, plaintiffs contend that when

crossing the border at a port of entry, they are referred for secondary inspection during which they are questioned, their person and property are searched, and they are subject to delays ranging from a few minutes to twelve hours, with the typical one being a couple of hours.

As discussed above, there is a long history of the government having the ability to exercise substantial power at the nation's borders. "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Indeed, the first Congress passed a bill to this effect. Act of July 31, 1789, ch. 5, 1 Stat. 29; *see also Boyd v. United States*, 116 U.S. 616, 624 (1886) (discussing the bill). Initially, the international border of greatest concern was the Atlantic coast, by which Europeans could enter the country via ship. *See* Federalist No. 12, *supra*, at 89 (Alexander Hamilton) (discussing the need "to guard [] the Atlantic Coast"). Over time, the task of guarding the northern and southern land borders emerged as the greater challenge. Since the start of the twentieth century, the government has operated checkpoints at which individuals crossing those borders must stop. *See* Border Patrol History, U.S. Customs and Border Patrol (last visited Feb. 24, 2021) (describing placement of officers at the southern border around 1904 to prevent illegal crossings), https://www.cbp.gov/border-security/along-us-borders/history. Delays and inconveniences at the borders are thus as old as the nation itself.

26

And again, precedent reinforces that history. The Supreme Court has made clear that the government has broad power to search and seize individuals at the border. Because the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," searches and seizures there "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2003). The Court also rejected any "right not to be subject to delay at the international border" because "delays of one to two hours at international borders are to be expected." *Id.* at 155 n.3. Indeed, the Supreme Court upheld a sixteen-hour detention at the border where officers did not communicate with the detainee during that time. *Montoya de Hernandez*, 473 U.S. at 537–38; *see also Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) (rejecting claim against CBP by five U.S. citizens who were detained when returning from Canada for several hours and subject to intrusive questions).

In light of such history and precedent, it is clear that plaintiffs do not possess a protected liberty interest in being free from screening and delays at the border. No plaintiff alleges he was unable to cross an international border. The plaintiffs complain of extra delays ranging from a few minutes to twelve hours, with most being on the shorter end of that spectrum. Such delays are not atypical for travelers, particularly at busy ports of entry at land borders. Given the government's broad power to control movement across the nation's borders, the burdens experienced by plaintiffs are not infringements of "liberty" within the meaning of the Due Process Clause.

27

3.

Our opinion, however, should not be read to suggest that law enforcement actions in airports or at the border are immune from judicial review. Litigants can proceed through other avenues, including Fourth Amendment claims. The Fourth Amendment exists to protect against unreasonable searches and seizures, including unreasonable uses of force by law enforcement. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386 (1989) (recognizing Fourth Amendment claim for excessive use of force by law enforcement). One great advantage of requiring litigants to proceed that way is that courts will be able to conduct the kind of individualized case-by-case analyses that are precluded in a facial due process challenge.

Incrementalism and individualization are important to the common-law method. These qualities describe as well the development of "reasonableness" jurisprudence under the Fourth Amendment. Facial challenges are by contrast and definition impatient ones, not well suited to the multiple layers of sensitivity that surround this case. Plaintiffs come before us with wildly varying circumstances and ask for a common remedy. A couple of plaintiffs state they experienced extreme encounters with law enforcement. *See, e.g.*, J.A. 564–72 (allegation by Murat Frljuckic that he was repeatedly arrested at gunpoint); J.A. 495–97 (allegation by Anas Elhady that he was detained in a freezing room for twelve hours until he passed out). Others allege only *de minimis* delays in international and domestic travel. *See, e.g.*, J.A. 82-83 (failing in complaint to identify any delays for plaintiff Baby Doe 2); J.A. 114–16 (failing to detail specific delays for plaintiff Samir Anwar). Although plaintiffs suggest that extreme encounters are the inevitable consequence of the TSDB system, that argument is belied by the fact that most of the

28

plaintiffs did not experience anything particularly dramatic. When considering this type of broad procedural due process claim, we are required, as noted, to focus on the "generality of cases, not the rare exceptions." *Mathews* 424 U.S. at 344. A few nonrepresentative encounters, plucked in isolation from millions of encounters occurring each year, are hardly a sound basis for redesigning the entire TSDB system. When aiming at a small and sensitive target, a scalpel is superior to a scythe. Or if scythe there should be, Congress in this area is best qualified to wield it.

## B.

Plaintiffs also allege in this appeal that inclusion in the TSDB infringes their constitutionally protected interest in their reputations. The Supreme Court has acknowledged a constitutional liberty interest in one's reputation. *See Din*, 576 U.S. at 91-92; *see also* 1 William Blackstone, Commentaries on the Laws of England *129 (1769) (explaining how due process protects an interest in "personal security," which includes one's "reputation"). But recognizing the potentially boundless nature of this right, the Court has established doctrinal limits to narrow the category of cases claiming reputational injury. A litigant must show a statement "stigmatizing his good name" and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that "alter[s] or extinguishe[s] one of his legal rights." *Paul v. Davis*, 424 U.S. 693, 706–011 (1976).

The plaintiffs' basic contention is that inclusion in the TSDB stigmatizes them by associating them with terrorism. We reject this argument for two reasons. First, plaintiffs' claims fall short because they have not shown adequate "public disclosure" by the

government. *Sciolino v. City of Newport News*, 480 F.3d 642, 647 (4th Cir. 2007). The government does not publicly disclose TSDB status. The federal government's intragovernmental dissemination of TSDB information to other federal agencies and components, to be used for federal law enforcement purposes, is not "public disclosure" for purposes of a stigma-plus claim. *See Asbill v. Housing Auth. of Choctaw Nation*, 726 F.2d 1499, 1503 (10th Cir. 1984). That comports with common sense; government could not function if every intra- or inter-departmental memo critical of a person created a constitutional claim. The same rationale explains why disclosure to state or tribal law enforcement agencies does not constitute public disclosure.

The question remains whether the government's decision to allow certain private entities to access the TSDB constitutes publication. In *Sciolino*, we recognized that making stigmatizing information available to prospective employers could, in some circumstances, constitute publication. 480 F.3d at 649–50. However, we made clear that plaintiffs must plead more than the simple act of making derogatory information available; they must prove that information is "likely to be inspected by prospective employers." *Id.* at 649. On this record, we cannot say plaintiffs have met that burden. After full discovery, the plaintiffs still allege only that the government makes this information available. J.A. 478-79 (plaintiffs' memorandum in support of motion for summary judgment). They do not point to specific instances where private employers looked at this evidence or made employment decisions based upon it. Moreover, *Sciolino* dealt with the dissemination of information that could be available to a wide range of employers. *Id.* at 650 (noting that plaintiffs can satisfy their burden of proof by showing that the government "has a practice

30

of releasing [the damaging information] to all inquiring employers"). Here, in contrast, TSDB status is made available only to a select number of private companies that work closely with issues related to national security, like nuclear power and chemical plants. Under these circumstances and based on this record, we do not think the government has publicly disseminated the plaintiffs' TSDB statuses in a manner sufficient to constitute an injury of constitutional proportion.

Plaintiffs' argument fails for another reason. The Supreme Court has explained that stigma or "reputation alone, apart from some more tangible interests such as employment," is not "liberty" within the meaning of the Due Process Clause. *Davis*, 424 U.S. at 701. In *Davis*, the Court found no protected liberty interest when state officials falsely included Davis's name on a list of shoplifters circulated to over eight hundred local businesses. *Id.* at 695–96. If that action—which undoubtedly humiliated Davis in the community and caused negative consequences at work, *id.* at 696—did not constitute an infringement of reputational liberty under the Due Process Clause, it is hard to see how we can recognize plaintiffs' alleged reputational injuries in this case.

*Davis* makes clear that it is not enough that a disclosure of negative information might make people think badly of you. "A plaintiff must demonstrate that his reputational injury was accompanied by a state action that distinctly altered or extinguished his legal status." *Shirvinski v. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (internal quotation marks omitted). For example, it is not enough if the government defames one of its employees; that employee can only allege infringement of a reputational liberty interest if

31

the government subsequently terminates his employment because of that defamation. *See Davis*, 424 U.S. at 706. Lower courts call this a "stigma-plus" showing.

Plaintiffs cannot make this "plus" showing because they have not demonstrated that TSDB status has altered their legal status or extinguished rights. First, they argue that the burdens imposed by TSDB status on their right to travel constitutes a "plus" showing. But as explained above, plaintiffs do not have a legal right to travel without delays and inconveniences. Their right to travel interstate or internationally has not been extinguished, which is partly why the court in *Beydoun* rejected a similar claim of stigma-plus injury. 871 F.3d at 469 (stating that "because Plaintiffs could still fly, after passing enhanced screening and experiencing delays, they were not deprived of any previously held rights" and thus could not establish "the 'plus' part" of their claims).

The district court concluded that plaintiffs demonstrated a "plus" injury because inclusion on the TSDB could affect plaintiffs "in traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Elhady*, 391 F. Supp. 3d at 580. The district court erred, however, in concluding that this is an adequate "plus" injury.

The Tenth Circuit rejected a nearly identical argument in *Abdi*, where the plaintiff argued that his inclusion on the Selectee List could potentially prevent him from accessing the financial system, opening or maintaining bank accounts, making wire transfers, sponsoring his immediate relatives' permanent residency, entering foreign nations, purchasing guns, obtaining a commercial driver's license to transport hazardous materials, working for an airport or airline, or obtaining an FAA license. *Abdi*, 942 F.3d at 1033. *Abdi*

rejected this argument for two reasons. First, the plaintiff had not actually alleged full denials of those rights and privileges. *Id*. at 1033-34. Second, and more importantly, the court rejected the argument because the government's act of including names in the TSDB does not *mandate* that private entities deny people such privileges. *Id.* at 1034. It merely makes information available to private entities, like companies handling nuclear power, and then those companies make their own choices. As *Abdi* explained, the plaintiff alleged only that "the government disseminates the watchlist 'with the purpose and hope'" that recipients "'will impose consequences on those individuals,'" but such "'purpose and hope' is not a mandate" that constitutes the alteration of a legal right or status for purposes of a stigma-plus claim. *Id*.

So too here. The plaintiffs have not actually alleged an inability to gain employment, obtain permits or licenses, or acquire firearms. One plaintiff claims he lost his job, but the record does not allow us to conclude this was *because* of TSDB status as opposed to other reasons. In a deposition, that plaintiff admitted he was not terminated because of any watch list status, but because he "and the manager didn't get along." J.A. 407–08. Another alleges he could not get a job as a police officer in one city because of TSDB status, but his sole basis for that belief is that some friends who applied got interviews while he did not. J.A. 500–01. Plaintiffs also cite delays and a reduced likelihood of obtaining various kinds of licenses and permits. For example, one plaintiff alleged a delay in getting a concealed carry permit due to TSDB status, though he admitted he had no "obstacles or problems" in acquiring his three firearms. J.A. 551. This isolated wait, which could have occurred for a whole host of reasons, does not lead us to conclude that TSDB status results in the

33

termination of one's Second Amendment rights.[5] In short, plaintiffs have not adequately demonstrated denials of employment, permits, licenses, or firearms. Speculation coupled with a few isolated incidents inadequately tethered to TSDB status is not enough. The district court acknowledged the weakness of plaintiffs' evidence on this score, *Elhady*, 391 F. Supp. 3d at 580, and we concur with its assessment.

C.

Because we conclude that plaintiffs have not demonstrated infringements of constitutional liberty interests under the Due Process Clause, we need not address plaintiffs' claims as to the adequacy of existing processes. But in all events it remains unclear that additional DHS TRIP procedures may be judicially mandated. Whether the process afforded is constitutionally adequate depends on balancing (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the . . . fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

---

[5] As for alleged delays in obtaining visas and other immigration privileges, there is no legal injury because there is no legal right to speedy grants of such privileges. *See, e.g.*, *Ruiz-Diaz v. United States*, 703 F.3d 483, 487–88 (9th Cir. 2012). If alleged governmental delays in processing the multitude of applications received created constitutional questions, the federal courts would never see an end to such cases.

Several factors make us doubt the merits of plaintiffs' arguments under this framework. First, the government's interest is extraordinarily significant in this case. "[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). The government claims that the TSDB is at the core of its counterterrorism apparatus and that burdening it with more procedures would markedly increase the risk of terrorist incidents. *See, e.g.*, J.A. 321 ("The TSDB is key to TSA's ability to counter ongoing terrorist threats."); J.A. 362 ("The TSDB plays a critical role in the FBI's mission by enabling the FBI and its partners to share relevant information necessary to carry out their respective missions in a concerted effort to prevent terrorist attacks.").

Of course, courts must not uncritically defer to such national security claims. Otherwise, national security will become a talisman summoned by the government to avoid scrutiny of infringements of constitutional rights. Thus our analysis would in no sense preclude those cases in which national security justifications were being used in an improper or pretextual manner. The very breadth of the term "national security" can make it an unduly tempting explanation for dubious actions that have little or no connection to national security at all. But neither may we reflexively disregard the Executive Branch's judgments in the national security area. As the Supreme Court has noted, the Executive Branch's "evaluation of the facts [in national security contexts] is entitled to deference." *Humanitarian Law Project*, 561 U.S. at 33. Courts lack the expertise and competence to second-guess decisions made about national security needs. After all, "federal judges [do

not] begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene v. Bush,* 553 U.S. 723, 797 (2008).

Second, the weight of the private interests at stake is comparatively weak. In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), the Supreme Court applied the *Mathews v. Eldridge* balancing test and held that procedural due process required the government to give limited hearings to indefinitely detained U.S. citizens who were accused of being enemy combatants in the war on terror. *Id.* at 538–39. In part, the Court expressed concern about the risk of erroneous determinations that individuals were enemy combatants, describing that risk as "unacceptably high." *Id.* at 533. But the decision hinged largely on the weight of Hamdi's private interest, which the Court described as "the most elemental of liberty interests—the interest in being free from physical detention by one's own government." *Id.* at 530. Even under those circumstances, the Court acknowledged that proceedings to determine enemy combatant status may be tailored to accommodate the government's interests; it approved, for example, the use of hearsay evidence and a presumption in favor of the government's evidence. *Id.* at 533–34. When compared to the prospect of indefinite detention as an enemy combatant, plaintiffs' complaints about delays in airports and in border crossings seem relatively minor.

Third, we would not casually second-guess Congress's specific judgment as to how much procedure was needed in this context. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319–20 (1985) (underscoring the "deference [courts] customarily must pay to the duly enacted and carefully considered decision of a coequal and representative branch of our Government" because "legislatures are to be allowed

considerable leeway to formulate such processes without being forced to conform to a rigid constitutional code of procedural necessities"); *see id.* at 326. After the TSDB was created, Congress considered the proper balance between effective counterterrorism efforts and the desire of air travelers to fly without undue burdens. It accommodated those competing interests by mandating the creation of DHS TRIP, a system that ensures that TSDB determinations are checked and reviewed. Congress recognized that the government's assessments in this area may not be foolproof. It nonetheless did not require the DHS TRIP redress process to eliminate all possibility of error, but only to reasonably mitigate the risk of possible errors. 49 U.S.C. § 44903(j)(2)(C)(iii)(II) (requiring TSA to "ensure that Federal Government databases that will be used to establish the identity of a passenger under the system will not produce a *large number* of false positives") (emphasis added); *see also id.* § 44926(b)(3)(B) ("*reduce* the number of false positives") (emphasis added). Congress made a policy choice, balancing the burdens imposed on the victims of false positives with the costs imposed on the entire country when a terrorist attack occurs. When such competing interests are at stake, value judgments must be made. Striking the balance in this most sensitive of areas belongs principally with the people's representatives.

\* \* \*

History and precedent reveal that the government possesses latitude in regulating travel, guarding the nation's borders, and protecting the aspirations of the populace for tranquility and safety. For "[u]nless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning."

37

*Wayte v. United States*, 470 U.S. 598, 612 (1985). We have such imperfect comprehension of the consequences of our interventions as to raise the prospect here of doing far more harm than good. Given the nation's need for unrelaxed vigilance against catastrophic threats, we can say with confidence only that the TSDB program matters and that it conforms to long-settled propositions of law. But saying that should be enough. Plaintiffs' procedural due process claims fail for the reasons set forth above. We thus reverse the district court's denial of the government's motion for summary judgment and remand this case with instructions to enter judgment in favor of the government.

*REVERSED AND*
*REMANDED*