**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1369

SAADIQ LONG, a/k/a Paul Anderson,

Plaintiff – Appellant,

and

LESHAUNA DAVES; JUANGJAN DAVES,

Plaintiffs,

v.

PAMELA JO BONDI, Attorney General; KASHYAP PATEL, Director of the Federal Bureau of Investigation, in his official capacity only; HA NGUYEN MCNEILL, Acting Administrator, Transportation Security Administration, United States Department of Homeland Security in her official capacity only; STEVEN MCQUEEN, Director of the Terrorism Screening Center, in his official capacity only; JOSEPH KENT, Director of the National Counterterrorism Center, Office of the Director of National Intelligence, in his official capacity only; KRISTI NOEM, Secretary, Department of Homeland Security,

Defendants – Appellees.

No. 24-1403

SAADIQ LONG, a/k/a Paul Anderson; JUANGJAN DAVES; LESHAUNA DAVES,

Plaintiffs – Appellees,

v.

PAMELA JO BONDI, Attorney General of the United States, in her official capacity only; KASHYAP PATEL, Director of the Federal Bureau of Investigation, in his official capacity only; STEVEN MCQUEEN, Director of the Terrorism Screening Center, in his official capacity only; JOSEPH KENT, Director of the National Counterterrorism Center, Office of the Director of National Intelligence, in his official capacity only; KRISTI NOEM, Secretary of Homeland Security, United States Department of Homeland Security, in her official capacity only; HA NGUYEN MCNEILL, Acting Administrator, Transportation Security Administration, United States Department of Homeland Security in her official capacity only,

Defendants – Appellants.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:15-cv-01642-MSN-WEF)

_____

Argued:  May 8, 2025                          Decided:  August 14, 2025

_____

Before GREGORY, RUSHING, and BENJAMIN, Circuit Judges.

_____

Vacated and remanded by published opinion.  Judge Rushing wrote the majority opinion, in which Judge Benjamin joined.  Judge Gregory wrote an opinion concurring in part and dissenting in part.

_____

**ARGUED:**   Gadeir Ibrahim Abbas, COUNCIL ON AMERICAN ISLAMIC RELATIONS, Washington, D.C., for Appellants/Cross-Appellees.  Joshua Paul Waldman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees/Cross-Appellants.  **ON BRIEF:**  Lena F. Masri, Justin Sadowsky, COUNCIL ON AMERICAN ISLAMIC RELATIONS, Washington, D.C., for Appellant/Cross-Appellee.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellees/Cross-Appellants.

_____

2

RUSHING, Circuit Judge:

Plaintiff Saadiq Long is a United States citizen listed in the Terrorist Screening Dataset (TSDS), otherwise known as the Terrorist Watchlist, and previously included on its subset No Fly List. Long sued various government officials to contest his status on both lists on constitutional and statutory grounds. While the case was pending, Long was removed from the No Fly List. A prior panel of this Court accordingly instructed the district court to dismiss Long's No Fly List claims as moot. Since then, however, the Supreme Court has held that an individual's removal from the No Fly List does not necessarily render claims like Long's moot. We find that ruling applicable here and so vacate the judgment and remand for the district court to adjudicate Long's No Fly List claims to the extent allowed by 49 U.S.C. § 46110.

We also vacate the district court's judgment dismissing Long's claims about his status on the broader Terrorist Watchlist. The district court dismissed those claims for lack of standing. But we conclude that Long has adequately alleged a redressable injury flowing from his placement on the Watchlist, namely that the Transportation Security Administration (TSA) has denied him credentials relevant to his work as a truck driver. We remand these claims to the district court so it can evaluate in the first instance Defendants' arguments that Long has failed to state a claim.

I.

A.

We begin with some background about the Watchlist and the No Fly List.

3

The TSDS—formerly called the Terrorist Screening Database (TSDB) and colloquially known as the Terrorist Watchlist—is the federal government's consolidated database containing "names and other identifying information (e.g., dates of birth, photographs, iris scans, and fingerprints)" of known or suspected terrorists. J.A. 225. The Watchlist is maintained by the Terrorist Screening Center (TSC),[1] a multi-agency entity administered by the Federal Bureau of Investigation (FBI). "The FBI and TSC work in coordination with the National Counterterrorism Center and the Department of Homeland Security (DHS) and its components, including the [TSA] and U.S. Customs and Border Protection (CBP)." *Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021). Federal agencies nominate an individual to the Watchlist, then TSC determines whether the individual warrants inclusion based on "articulable intelligence or information" supporting a "reasonable suspicion that the person is engaged, has been engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and / or terrorist activities." J.A. 225. TSC regularly evaluates and audits the Watchlist. It also conducts a biannual review of all records about citizens and lawful permanent residents on the Watchlist (called U.S. person records) to ensure that the underlying information still supports individuals' inclusion on the list.

---

[1] On March 19, 2025, the FBI renamed the Terrorist Screening Center the Threat Screening Center "to reflect an expanded mission." FBI National Press Office, *The Terrorist Screening Center Changes Name to the Threat Screening Center* (Mar. 19, 2025), https://www.fbi.gov/news/press-releases/the-terrorist-screening-center-changes-name-to-the-threat-screening-center [https://perma.cc/3UT8-PBKM].

Beyond federal agencies, Watchlist data is available to state and local law enforcement agencies, for specific law enforcement purposes, through the National Crime Information Center (NCIC), a database administered by the FBI. *See* 28 U.S.C. § 534. The NCIC contains the biographic and biometric information necessary to identify individuals on the Watchlist but does not contain "the underlying classified intelligence or other derogatory information that is the basis for the individual's inclusion in the database." J.A. 225.

The Watchlist contains subclassifications, including the No Fly List. To place an individual on the No Fly List, TSC must determine that, "in addition to meeting the reasonable suspicion standard" required to be placed on the Watchlist, the individual poses a threat of committing an act of terrorism with respect to an aircraft, the homeland, or U.S. facilities or interests abroad, or poses a threat of engaging in a violent act of terrorism and is operationally capable of doing so. J.A. 227. Individuals on the No Fly List "are prohibited from boarding flights on U.S. carriers as well as flights into, out of, over, or within U.S. airspace." J.A. 227. To implement security measures necessary to prevent listed individuals from flying, TSC shares No Fly List information with TSA, the agency "responsible for security in all modes of transportation, including . . . civil aviation security." 49 U.S.C. § 114(d).

TSA also has responsibilities with respect to the composition of the No Fly List. TSA administers the DHS Traveler Redress Inquiry Program (DHS TRIP), through which individuals who believe they experienced travel problems because they were wrongly identified as a security threat may request that TSA correct erroneous information. *See* 49

U.S.C. §§ 44903(j)(2)(C)(iii)(I) (directing TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system"), 44926(a) (directing DHS similarly).  After receiving an inquiry, "TSA, in coordination with the TSC and other appropriate Federal law enforcement or intelligence agencies, . . . will review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response."   49 C.F.R. § 1560.205(d).  A U.S. person who was denied boarding for a flight and is determined to be appropriately on the No Fly List after review by the TSC Redress Office receives a letter stating that he is on the No Fly List and providing the option to request additional information.  If the person requests additional information, "DHS TRIP will respond with a second letter that identifies the specific criterion or criteria under which the individual was placed on the No Fly List," including "an unclassified summary of information supporting" the placement, to the extent feasible without compromising national security or law enforcement interests.  J.A. 298.  The second letter also provides the option to seek additional review and invites the person to submit any information believed to be relevant to determining whether inclusion on the No Fly List is appropriate.

After considering all available information, the TSC Redress Office then makes a recommendation to the TSA Administrator about whether the person should remain on the No Fly List or be removed.  The TSA Administrator reviews the TSC recommendation and the U.S. person's entire DHS TRIP file and "will either remand the case back to TSC with

6

a request for additional information or clarification or issue a final order removing the United States person from the No Fly List or maintaining him on the List."[2]  J.A. 299.

Once the redress process is complete and the TSA Administrator has issued his final order, "TSC continues to independently review the No Fly List as a matter of course." *Moharam v. TSA*, 134 F.4th 598, 604 (D.C. Cir. 2025).  "As the sole agency in control of the List, TSC alone retains authority to remove individuals from the No Fly List, separate and apart from the TSA's implementation of TRIP, which is only triggered by a redress request." *Id.*

## B.

Plaintiff Saadiq Long, formerly known as Paul Anderson, is a U.S. citizen who served in the United States Air Force for nearly eleven years.  J.A. 58.  While stationed in Turkey, Long converted to Islam, changed his name, and unsuccessfully requested conscientious objector status.  He was later discharged from the Air Force and moved to Egypt with his family, living there for four years before moving to Qatar in 2003.

In 2012, Long attempted to fly to the United States to visit his ailing mother, but an airline representative informed Long that he was on the No Fly List and was not permitted to board the flight.  Long filed a DHS TRIP request and a few months later, despite receiving no response from DHS TRIP, received permission to fly to the United States. While in the United States, Long met with FBI agents, who allegedly questioned him about

---

[2] Before 2015, TSC made the final decision at the conclusion of the DHS TRIP process.  Today, however, "'the TSA Administrator . . . is the final decisionmaker.'" *Moharam v. TSA*, 134 F.4th 598, 604 (D.C. Cir. 2025) (quoting *Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019)).

his time in the Air Force, his conversion to Islam, and his request for conscientious objector status. Long returned to Qatar in 2013 by taking a bus to Mexico and boarding a flight from there. Once he was back in the Middle East, Long alleges that he and his family experienced more travel restrictions, unlawful searches and detentions, and harassment by foreign law enforcement, all of which he attributes to his Watchlist and No Fly List designations.

After allegedly being banned from multiple countries, Long and his family were permitted to fly to the United States in January 2016. Since then, Long has resided in Oklahoma and worked as a truck driver, although he claims a "truck company terminated his employment . . . after being contacted by" the FBI. J.A. 71. He further alleges that since returning to the United States he has been denied the purchase of a firearm and had a bank account closed, which he attributes to his Watchlist status.

C.

Long first sued U.S. government officials in 2015, seeking removal from the Watchlist and No Fly List, among other relief. After he sued, Long made another DHS TRIP request, and the district court stayed proceedings pending resolution of that process. In a series of letters, DHS TRIP informed Long that he was on the No Fly List because he had been identified as a person "who represents a threat of engaging in or conducting a violent act of terrorism and [is] operationally capable of doing so." J.A. 302. DHS TRIP explained that Long "participated in training that may make [him] a threat to U.S. national security" and his "arrest in Gaziantep, Turkey (not far from the Syrian border) in November 2015 is of concern to the U.S. Government." J.A. 302–303. Long submitted a written

8

response, and in April 2019, TSA's Acting Deputy Administrator issued a final decision concluding that Long was "properly included on the U.S. Government's No Fly List." J.A. 287.

Long then amended his complaint in August 2019, again bringing numerous constitutional and statutory challenges and naming as defendants the Attorney General of the United States, FBI Director, TSC Director, National Counterterrorism Center Director, Secretary of Homeland Security, and TSA Administrator. In his amended complaint, Long alleges an equal protection violation, claiming that "Defendants considered and relied upon" his "race, ethnicity, national origin, religious affiliation, or First Amendment protected activities" "in placing [him] . . . on the federal terrorist watchlist." J.A. 85 (Count V) (internal quotation marks omitted). For similar reasons, Long alleges a substantive due process violation and asserts his placement "on the federal terrorist watchlist" imposes "the stigmatizing label of 'known or suspected terrorist[],'" which is "widely disseminat[ed] . . . to numerous governmental and private partners" in a manner that "shock[s] the conscience." J.A. 73 (Count I). In addition to violating his substantive rights, Long alleges that Defendants' actions in placing him on the Watchlist and No Fly List deprived him of the right to travel and labeled him a terrorist without "a constitutionally adequate legal mechanism to challenge that designation," in violation of procedural due process. J.A. 79 (Count II). He asserts all these constitutional claims both facially and as applied.

The amended complaint also raises statutory claims. Long alleges that Defendants' "actions in placing [him] . . . on the federal terrorist watchlist, . . . disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally

9

adequate avenue for redress" must "be set aside as unlawful pursuant to" the Administrative Procedure Act (APA), 5 U.S.C. § 706. J.A. 81–82 (Count III). He also claims that Defendants "lack[] statutory and regulatory authority to share [his] information through the NCIC" because "[n]either 28 C.F.R. § 20.20 and 28 U.S.C. § 534, nor any other provision, allows sharing non-criminal information such as watchlist information." J.A. 83 (Count IV). Finally, Long says that Congress neither directed nor "provided the Executive Branch with intelligible principles from which the Executive can implement its watchlist schemes regarding civil aviation and national security." J.A. 89 (Count VIII).[3] For both his constitutional and statutory claims, Long continues to seek only declaratory and injunctive relief.

On April 2, 2020, the district court transferred Long's "as-applied claims in Counts I, II, III, and V" to this Court and stayed the remainder of his claims, including his facial challenges within the same counts.[4] *Long v. Barr*, 451 F. Supp. 3d 507, 530 (E.D. Va. 2020). According to the district court, it lacked jurisdiction to adjudicate "Long's as-applied challenges to his redress proceedings and his ongoing Watchlist status," *id.* at 529, pursuant to 49 U.S.C. § 46110(a), which grants exclusive jurisdiction over challenges to "an order issued by the . . . Administrator of the [TSA]" to the "United States Court of Appeals for the District of Columbia Circuit or . . . the court of appeals of the United States for the circuit in which the person resides." Although the district court recognized that

---

[3] Long voluntarily dismissed Counts VI, VII, and IX.

[4] The district court also dismissed all claims brought by Long's co-plaintiffs, who did not appeal.

10

Long's claims asked it to "consider issues of . . . TSDB nomination and inclusion, and TSC policies that determine the very existence and composition of the No Fly List," it "decline[d] to exercise simultaneous jurisdiction over claims that might nullify the Fourth Circuit's review, as such divestment would be contrary to the clear intent of § 46110." *Long*, 451 F. Supp. 3d at 530.

Before this Court could weigh in, TSC removed Long from the No Fly List. *See Long v. Pekoske*, 38 F.4th 417, 422 (4th Cir. 2022). DHS TRIP informed Long that he had been removed "based on an assessment of the currently available information" and would "not be placed back on the No Fly List based on the currently available information." J.A. 307. The government also filed in this Court a sworn declaration from TSC's Deputy Director for Operations stating the same. Based on the letter and sworn declaration, a prior panel of this Court held that Long's as-applied No Fly List claims were moot. *See Long*, 38 F.4th at 424–425. The Court remanded for the district court to "decipher which of Long's constitutional challenges remain justiciable." *Id.* at 427. In doing so, this Court "decline[d] to decide whether § 46110 deprives the district court of jurisdiction over Long's remaining as-applied challenges," but noted that "[i]f the court still finds it lacks jurisdiction, it should transfer the claims to either the D.C. or Tenth Circuit, the only circuits that may hear Long's claims on the merits." *Id.*

D.

Upon returning to the district court, Long filed a "verified supplemental pleading[]" that "adds to, rather than replaces" his amended complaint. J.A. 96–104. There, Long alleged that in October 2020 he applied and was initially approved for a TSA

11

Transportation Worker Identification Credential (TWIC), which authorizes access to secure areas of regulated facilities and vessels. TSA later rescinded that approval as made in error, and at the time of the supplemental pleading had not issued a final determination on Long's application. Long also applied for a Hazardous Material Endorsement (HME) on his commercial driver's license, but TSA had not decided that application either.[5]

Long's supplemental pleading further alleged that he was stopped by Oklahoma City Police Department officers five times between November 2022 and January 2023 based on his Watchlist status, which was available to local officers through the NCIC database. In February 2023, Long and the police department "entered into a stipulation stating that [Oklahoma City Police Department] will not stop Long or any other person based solely on that individual's '[known or suspected terrorist] File status' in the NCIC." J.A. 103.

On Defendants' motion, the district court dismissed all of Long's claims for lack of subject matter jurisdiction. The court determined that "Long's facial challenges to the No Fly List are moot after his removal from the list because there is not an impending risk of future injury tied to the policy that he challenges." *Long v. Garland*, No. 1:15-cv-01642,

---

[5] Shortly before oral argument in this appeal, TSA sent Long two letters preliminarily denying his TWIC and HME applications. *See* ECF No. 55. The letters explain that TSA "has determined that [Long] may not be eligible" for either credential "for the reasons set forth in 49 C.F.R. § 1572.107(a)," ECF No. 55 at 1, 6, under which "TSA may determine that an applicant poses a security threat based on a search of . . . Terrorist watchlists and related databases," 49 C.F.R. § 1572.107(a). We grant Defendants' motion to supplement the record with these letters. *See* ECF No. 53. Having heard from neither party any basis for sealing these records, we deny Defendants' motion to seal.

2024 WL 761850, at *5 n.3 (E.D. Va. Feb. 23, 2024). As for Long's other claims, the court observed that his "alleged injuries have shifted" after his removal from the No Fly List, now focusing on injuries stemming from his asserted inclusion on the Watchlist. *Id.* at *3. But the court concluded that "[n]one of these alleged harms establish standing." *Id.* First, Long no longer faced a "certainly impending risk of future injury" from the Oklahoma City Police Department, which had entered a stipulation agreeing not to stop him again based on his Watchlist status. *Id.* (internal quotation marks omitted). Second, the district court determined that Long's pending TWIC and HME applications could not support standing because they had not been denied and, to the extent Long complained about the delay, he had not pursued legal remedies to compel agency action. *See id.* (citing 5 U.S.C. § 706(1) and 28 U.S.C. § 1361). Third, Long's travel-related harms, purported inability to purchase a firearm, and bank account closure dated from his time on the No Fly List and could not establish a threat of future imminent injury. *Id.* at *4 & n.1. And finally, the district court noted that this Court has rejected Long's claim that intragovernmental "dissemination . . . of his Watchlist status" can show a cognizable injury. *Id.* (citing *Elhady*, 993 F.3d at 225).

Long appealed the district court's dismissal of his complaint. Defendants cross-appealed to argue in the alternative that Long's Watchlist claims fail to state a claim on which relief can be granted. We have jurisdiction, *see* 28 U.S.C. § 1291, and review de novo the district court's dismissal for lack of subject matter jurisdiction, *see Evans v. United States*, 105 F.4th 606, 612 (4th Cir. 2024); *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020).

13

II.

A.

We begin with Long's No Fly List claims. Less than a month after the district court dismissed Long's complaint, the Supreme Court decided *FBI v. Fikre*, which "resolve[d] [a] conflict in lower court authority" between this Court's prior decision in this case and the Ninth Circuit's decision in *Fikre* regarding whether removal from the No Fly List moots certain challenges to an individual's placement on that list. 144 S. Ct. 771, 777 (2024) (citing *Long*, 38 F.4th at 427).

In the Ninth Circuit, Yonas Fikre challenged his inclusion on the No Fly List on substantive and procedural due process grounds, claiming "that the government placed [him] on the . . . No Fly List despite lacking any reasonable suspicion that [he] is a known, suspected, or potential terrorist and . . . relie[d] on race, ethnicity, national origin, religious affiliation, and First Amendment protected activities as factors supporting placement." *Fikre v. FBI*, 35 F.4th 762, 775 (9th Cir. 2022) (internal quotation marks and emphases omitted). During litigation, TSC removed Fikre from the No Fly List and submitted a declaration stating he would "not be placed on the No Fly List in the future based on the currently available information." *Id.* at 767 (internal quotation marks omitted). The Ninth Circuit held that the government's declaration did not moot Fikre's claims because "he could be placed on the list again for the same reasons that prompted the government to add him to the list in the first place." *Id.* at 772 (internal quotation marks omitted).

A unanimous Supreme Court agreed with the Ninth Circuit. Although the government's declaration "may mean that [Fikre's] past actions are not enough to warrant

14

his relisting," the Court reasoned that the declaration did not address whether the government might relist him in the future for constitutionally impermissible reasons like those he alleged it had considered previously. 144 S. Ct. at 778. Ultimately, the Supreme Court concluded that "the government's sparse declaration falls short of demonstrating that it cannot reasonably be expected to do again in the future what it is alleged to have done in the past," such as placing Fikre on the No Fly List for unlawful reasons related to the exercise of his religion. *Id.* at 777–778.

*Fikre* controls here and requires us to vacate the district court's judgment dismissing Long's No Fly List claims as moot. Like Fikre, Long alleged that Defendants "considered and relied upon" his "race, ethnicity, national origin, religious affiliation, or First Amendment protected activities" in placing him on the No Fly List.[6] J.A. 76 (internal quotation marks omitted). And like the declaration in *Fikre*, TSC here represented only that Long would not be "placed back on the No Fly List in the future based on the currently

---

[6] In a notice of supplemental authority, *see* Fed. R. App. P. 28(j), Defendants argue this case is like *Moharam v. TSA*, 134 F.4th 598 (D.C. Cir. 2025), because Long doesn't contend the bases for placing him on the No Fly List were unconstitutional. That is incorrect, as his complaint demonstrates.

More fundamentally, this case is not like *Moharam* because the plaintiff there petitioned for review of the TSA Administrator's final order determining he was properly included on the No Fly List, requesting that the court of appeals "'amend, modify, or set aside'" that decision. 134 F.4th at 605 (quoting 49 U.S.C. § 46110(c)). When TSC subsequently removed Moharam from the No Fly List, its decision superseded that of the TSA Administrator and mooted Moharam's petition for review of the Administrator's order, which was "limited to the record before the agency when it upheld his status on the List." *Id.* at 608–609. Unlike Long, Moharam did not seek declaratory or injunctive relief, *id.* at 605, nor did he challenge the legality of the bases TSC used to initially place him on the list, *id.* at 606–607. For those reasons, *Fikre* did not control in *Moharam* and does control here.

15

available information." J.A. 309. *Fikre* makes clear that representation is insufficient to carry the government's "burden to establish that it cannot reasonably be expected to resume its challenged conduct." *Fikre*, 144 S. Ct. at 778 (internal quotation marks and emphasis omitted).

We recognize, of course, that a prior panel of this Court previously held to the contrary in this very case, and the district court was following our lead in finding the claims moot. But "the law of the case" as established by the decision of an appellate court need not be followed in "'a later appeal'" if "'controlling authority has since made a contrary decision of law applicable to the issue.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (quoting *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)). Likewise, "we are not bound by previous panels [of this Court] where 'the prior opinion has been overruled by an intervening opinion from . . . the Supreme Court.'" *Payne v. Taslimi*, 998 F.3d 648, 655 n.4 (4th Cir. 2021) (quoting *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004)). That is what happened here, and our mandate to follow the Supreme Court's commands overcomes both horizontal stare decisis and the law of the case. In accordance with *Fikre*, we must conclude Defendants have "not yet demonstrated" that Long's claims challenging his placement on the No Fly List are moot. *Fikre*, 144 S. Ct. at 779.

## B.

Defendants respond that even if Long's No Fly List claims are not moot, the district court nevertheless lacks jurisdiction to adjudicate them because of 49 U.S.C. § 46110, which channels review of TSA orders directly to courts of appeals. We disagree.

16

Section 46110 provides that "a person disclosing a substantial interest in an order issued by . . . the Administrator of the [TSA] with respect to security duties and powers designated to be carried out by the Administrator . . . in whole or in part under this part . . . may apply for review of the order by filing a petition for review in" the D.C. Circuit or the court of appeals for the circuit where he resides. 49 U.S.C. § 46110(a). The circuit court "has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order." *Id.* § 46110(c). Congress "plainly and clearly" directed in Section 46110 "that a court of appeals is to hear, in the first instance, a challenge to an order of the TSA Administrator." *Blitz v. Napolitano*, 700 F.3d 733, 741 (4th Cir. 2012).

The parties agree that the TSA Administrator's April 2019 determination, at the end of the DHS TRIP process, that Long was "properly included on the U.S. Government's No Fly List" constitutes an order subject to Section 46110. J.A. 287 ("This letter constitutes the [TSA's] final agency decision, which is reviewable by a United States Court of Appeals under 49 U.S.C. § 46110."); *see* 49 U.S.C. § 44903(j)(2)(C)(iii)(I), (j)(2)(G)(i). But TSA's 2019 order is no longer in effect. TSC subsequently removed Long from the No Fly List, and DHS TRIP informed him in September 2020 that TSC's decision "supersede[d]" the TSA Administrator's April 2019 decision. J.A. 307; *see also Moharam*, 134 F.4th at 604 ("The Government has explained that TSC's independent removal of [an individual] from the No Fly List supersedes any legal effect of the TSA Administrator's prior final order."). TSA's decision to retain Long on the No Fly List no longer "represents the final disposition of the matter." *Blitz*, 700 F.3d at 740. Indeed, if Long were challenging that superseded order, we would be compelled to dismiss his claims because we could not provide relief by

17

simply "affirm[ing], amend[ing], modify[ing], or set[ting] aside" TSA's order.  49 U.S.C. § 46110(c); *see also Moharam*, 134 F.4th at 609 (finding the "effects of the violation . . . eradicated" where "[t]he agency has set aside its determination that current information warranted Moharam's placement on the List.").

Instead of challenging TSA's decision at the end of the DHS TRIP process, Long challenges TSC's process and decision to place him on the No Fly List (and the Watchlist) "in the first place." *Fikre*, 35 F.4th at 775; *see also id.* at 773–775 (contrasting *Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019), in which plaintiffs challenged the TSA  Administrator's decisions refusing to remove them from the No Fly List under the DHS TRIP process). Long filed this lawsuit more than three years before the TSA Administrator issued her decision.  And any doubt about whether his amended complaint seeks review of the Administrator's order, or relief that would undermine that order, has been resolved by TSC's superseding decision to remove Long from the No Fly List.  To the extent Long seeks declaratory and injunctive relief regarding placement on the No Fly List, such relief could only be directed at TSC, which alone possesses the authority to place an individual on the list. *See Moharam*, 134 F.4th at 603–604; *Long*, 38 F.4th at 420.  Because "putting [Long's] name on the No-Fly List was an 'order' of an agency *not* named in section 46110," the district court retains jurisdiction to consider claims challenging that decision. *Fikre*, 35 F.4th at 775 (internal quotation marks omitted); *see Magassa v. Mayorkas*, 52

F.4th 1156, 1165 (9th Cir. 2022) ("Claims remain in district court if they . . . involve agencies not covered by § 46110 . . . ."). [7]

We observe, however, one wrinkle for the district court to consider on remand. As Defendants point out, parts of Long's amended complaint criticize the "[i]nadequacy of the DHS [TRIP] [p]rocess." J.A. 48. TSA created the DHS TRIP procedure at Congress's direction. *See* 49 C.F.R. §§ 1560.201–1560.207. And courts have held that a "challenge [to] the adequacy of the redress process . . . amount[s] to a challenge to a TSA order." *Mokdad v. Lynch*, 804 F.3d 807, 811 (6th Cir. 2015); *cf. Blitz*, 700 F.3d at 740 (holding that TSA's Checkpoint Screening standard operating procedures "constitute[] an order of the TSA Administrator under § 46110"). However, Long's complaint paints with a broad brush, and while some of his procedural concerns under this heading address DHS TRIP itself, others appear to implicate different stages of the process, like initial placement on the No Fly List. As before, "we decline to take a scalpel to Long's complaint" in the first instance. *Long*, 38 F.4th at 427. On remand, the district court should determine whether Long pursues a challenge to the DHS TRIP process and, if so, should consider whether

---

[7] For the same reasons, we reject Defendants' argument that Long's claims about TSC's process and decision to place him on the No Fly List are "inescapably intertwined" with review of the TSA Administrator's superseded order. *Mokdad v. Lynch*, 804 F.3d 807, 812 (6th Cir. 2015) (internal quotation marks omitted). As the government has represented in other litigation, "TSA does not maintain the watchlists, [and] can only remove an individual from the No Fly List as part of the TRIP process." *Moharam*, 134 F.4th at 603–604. Considering that TSC can list, remove, and relist an individual on the No Fly List all without TSA's input, we are unpersuaded that a challenge to TSC's actions is inescapably intertwined with TSA's superseded redress decision in this case.

Section 46110 deprives it of jurisdiction over that claim. *See Mokdad*, 804 F.3d at 812 (reserving this question).

III.

We turn next to Long's due process, equal protection,[8] and statutory claims challenging his placement on the Watchlist and Defendants' information-sharing practices, all of which the district court dismissed for lack of standing.

To establish Article III standing, Long must "allege facts demonstrating" that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted). An injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). Traceability requires "a causal connection between the injury and the conduct complained of," which rules out injuries resulting from "the independent action of some third party not before the court." *Id.* (internal quotation marks and brackets omitted). And redressability requires more than a "speculative" shot that a judicial order will provide relief. *Id.*

---

[8] Long's equal protection claim is properly before us, contrary to Defendants' assertion otherwise. Defendants rely on the district court's prior ruling dismissing the other two plaintiffs from this case; but that ruling did not purport to resolve Long's claim. The district court initially transferred the as-applied portion of Long's equal protection claim to this Court, staying the facial portion. This Court remanded, and on remand the district court considered and dismissed the equal protection claim for lack of standing.

To challenge his inclusion on the Watchlist and Defendants' information sharing practices, Long must adequately allege an injury traceable to those acts and practices and likely to be redressed by the relief he seeks. *See TransUnion LLC v. Ramierz*, 141 S. Ct. 2190, 2208 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). For that reason, standing to challenge placement on the No Fly List does not necessarily demonstrate standing to challenge placement on the Watchlist, even though Long lumps those claims together within the due process and equal protection counts of his complaint. And because Long seeks the "forward-looking relief" of an injunction, he must plausibly allege "a substantial risk of future injury" that is traceable to Defendants' conduct and "likely to be redressed by an injunction against them." *Murthy v. Missouri*, 144 S. Ct. 1972, 1993 (2024); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice" to support a claim for injunctive relief "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (internal quotation marks omitted)).

On appeal, Long argues that four purported injuries support his standing to bring these claims: (1) TSA's "effective denial" of his TWIC and HME applications; (2) an aborted firearm sale; (3) traffic stops by the Oklahoma City Police Department; and (4) the allegedly unlawful transmission of his Watchlist status to local law enforcement agencies

21

through NCIC.[9]    After careful review, we conclude that only the first category supports standing.

## A.

In his verified supplemental pleading, Long alleged that TSA had delayed—and so effectively denied—his TWIC and HME applications because he was on the Watchlist. He further alleged in his amended complaint that "the federal government . . . quer[ies] the federal terrorist watchlist prior to issuing" a TWIC or HME credential, and "being on the federal terrorist watchlist can prevent listed persons . . . from obtaining or renewing" those licenses.  J.A. 38.

TSA's effective denial of Long's applications for these commercially valuable licenses inflicts a concrete and particularized injury on him in his work as a truck driver. Long's allegation that this injury is traceable to his Watchlist status is plausible in view of the pertinent federal regulations.  Specifically, TSA denies "an HME or TWIC" to "an applicant [who] poses a security threat." 49 C.F.R. § 1572.5(a).  And "TSA may determine that an applicant poses a security threat based on a search of . . . [t]errorist watchlists and related databases." *Id.* § 1572.107(a)(2).  An injunction requiring TSC to remove Long's name from the Watchlist "would . . . redress his injury by removing the allegedly unconstitutional barrier" to approval of his applications. *Gutierrez v. Saenz*, 145 S. Ct. 2258, 2268 (2025); *see also Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir.

---

[9] Long does not press injuries related to travel problems, foreign governments, or closure of his bank account on appeal, so we do not consider them.

2018) ("[T]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." (internal quotation marks omitted)).

Although we have assessed Long's standing as of "the outset of the litigation," we further observe that TSA's subsequent letters to Long confirm the plausibility of his allegations. *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). On May 2, 2025, TSA sent Long two letters preliminarily denying his TWIC and HME applications because TSA "has determined that [Long] may pose a security threat."[10] ECF No. 55 at 1, 6. The letters informed Long that he "may not be eligible" for a TWIC or HME "for the reasons set forth in 49 C.F.R. § 1572.107(a)." ECF No. 55 at 1, 6. As explained above, those reasons include "a search of . . . [t]errorist watchlists and related databases." 49 C.F.R. § 1572.107(a)(2).

Defendants dispute that Long's Watchlist designation caused his applications to be denied. They claim that TSA queries the Watchlist only "to point . . . to the underlying information or intelligence that might exist about that person" which would warrant denial, "not the status in and of itself."[11] Oral Arg. 29:30–29:38. But even this rejoinder suggests that, were Long not on the Watchlist, TSA's queries would have turned up empty and it would not have assessed the "underlying information." Moreover, a person's presence on

---

[10] These preliminary denials "will automatically become final" in 60 days if Long does not submit a response or request an extension of time to respond. ECF No. 55 at 2, 6.

[11] While not in direct conflict, this representation may be in some tension with the declaration Defendants submitted from an FBI Supervisory Special Agent stating that "[t]he TSDS does not contain the underlying classified intelligence or other derogatory information that is the basis for the individual's inclusion in the database." J.A. 225.

23

the Watchlist tells TSA that TSC has a "reasonable suspicion that the person is engaged, has been engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and / or terrorist activities." J.A. 225. At this stage, we think it plausible that, as Long alleges, TSA relied at least in part on TSC's Watchlist determination in deciding that Long posed a security threat warranting denial of his TWIC and HME applications.

Defendants also contend that Long can challenge TSA's denial of (and previously, its delay in resolving) his TWIC and HME applications only by way of a petition to the court of appeals pursuant to 49 U.S.C. § 46110. If Long were challenging TSA's orders directly, we might agree. But he is not. Long's due process, equal protection, and statutory claims challenge TSC's actions in placing him on the Watchlist in the first place, and he alleges that "one of the harms emanating from [inclusion on] that list" is TSA's delay and ultimate denial of his applications. Reply Br. 18–19. As Defendants have admitted, "a decision by TSC on the Watchlist versus TSA with regard to these applications are two different decisions by two different agencies under two different standards." Oral Arg. 28:41–28:52. Long can contest TSC's decision in this litigation. He has standing to do so because he has plausibly alleged that TSC's decision to place him on the Watchlist has injured him in the form of delay and denial of his TWIC and HME applications. The district court can adjudicate Long's claims against TSC and can redress the alleged Watchlist injury without conducting any forbidden review of TSA's final orders on those applications.

24

B.

Turning to Long's three other alleged injuries, each centers on Defendants' purported disclosure of his Watchlist status to others. None satisfies the requirements for standing.

First, Long claims that "every unlawful transmission of his watchlist status [through NCIC] necessarily causes a redressable injury." Opening Br. 28. According to Long, federal law authorizes Defendants to disclose only criminal information, not Watchlist status, to local law enforcement agencies through NCIC. And "every dissemination" of his Watchlist status through NCIC therefore concretely harms him in a manner recognized by a "'privacy right at common law.'" Opening Br. 28 (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989)). We disagree.

Intangible harms are concrete for standing purposes when they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 141 S. Ct. at 2204. These include public disclosure of private facts, the harm to which Long analogizes. *See id.* ("disclosure of private information"); *Reps. Comm.*, 489 U.S. at 762 ("avoiding disclosure of personal matters"). But public disclosure of private facts tautologically requires "a public disclosure, and not a private one." William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 393 (1960); *see* Restatement (Second) of Torts § 652D cmt. a (1977) (requiring "publicity," which "means that the matter is made public, by communicating it to the public at large"); *id.* (contrasting "publication" for a defamation claim, "which includes any communication by the defendant to a third person").

25

"The government does not publicly disclose TSDB status," that is, Watchlist status. *Elhady*, 993 F.3d at 225. In *Elhady*, this Court reasoned that "disclosure [of Watchlist status] to state or tribal law enforcement agencies does not constitute public disclosure." *Id.* at 225–226; *see also Long*, 38 F.4th at 426. That conclusion accords with "the web of federal statutory and regulatory provisions that limits the disclosure" of NCIC information. *Reps. Comm.*, 489 U.S. at 764–765; *see also* 28 U.S.C. § 534(a)(4) (authorizing transmittal to "authorized officials of the Federal Government . . . , the States . . . , Indian tribes, cities, and penal and other institutions"). Without public disclosure, Long's asserted harm from transmission of his Watchlist status through NCIC does not "bear[] a sufficiently close relationship" to the harm from public disclosure of private facts. *TransUnion*, 141 S. Ct. at 2209. His dissemination theory of standing therefore fails.

Second, Long argues that dissemination of Watchlist status to local law enforcement through NCIC concretely harms him because officers of the Oklahoma City Police Department have repeatedly initiated unlawful traffic stops based on his Watchlist status. This allegation does not suffice because, in the same pleading, Long concedes that he has since entered a stipulation with the Oklahoma City Police Department in which it agreed "not [to] stop Long or any other person based solely on that individual's [Watchlist] status." J.A. 102–103. Accordingly, there is no longer a substantial risk of such future encounters, and "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). To the extent Long now suggests that an officer has failed to abide by the stipulation in at least one instance, he fails to allege that isolated incident is

26

anything more than "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

Third and finally, Long argues that he is concretely harmed by dissemination of his Watchlist status through NCIC because he has been unable to purchase a firearm. His allegations, however, fail to plausibly plead that injury is traceable to his inclusion on the Watchlist. Long principally alleges that, when he visited his mother in Oklahoma over a decade ago, he tried to buy a gun and passed the background check, but when he arrived at the store to retrieve the gun, the shop attendant informed him "that the 'authorities' called [and said] Long was not authorized to purchase a weapon." J.A. 64–65. He also alleges, without any detail, that "[s]ince filing this lawsuit" in 2015, he "was again denied the purchase of a gun." J.A. 70. No allegation plausibly connects the dissemination of Watchlist status through NCIC to Long's difficulty purchasing a firearm. Federal law does not prohibit a person on the Watchlist from buying a gun, and Long does not contend that Oklahoma law imposes such a ban either. Indeed, Long alleges that he passed his background check, which typically queries the NCIC database. Long's injury is not traceable to dissemination of Watchlist information through NCIC.

In conclusion, at this stage of the proceedings, we are satisfied that Long has plausibly alleged a concrete injury traceable to his inclusion on the Watchlist and redressable by an injunction in his favor—that is, TSA's refusal to grant his TWIC and HME applications. But Long has not sufficiently alleged a cognizable injury traceable to the dissemination of his Watchlist status through NCIC. The parties have not addressed

27

whether this conclusion requires dismissal of Count IV, which specifically concerns NCIC, so we leave that question for the district court on remand.

## IV.

Defendants cross-appeal from the district court's Rule 12(b)(1) dismissal, asking us to affirm on the alternative ground that Long's Watchlist allegations are insufficient to state a claim for relief, *see* Fed. R. Civ. P. 12(b)(6). "'It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.'" *Hulsey v. Cisa*, 947 F.3d 246, 252 (4th Cir. 2020) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). We see no reason to depart from that salutary practice here, where assessing the alternative ground "would require extensive analysis of issues never addressed by the district court, which is better positioned to consider them in the first instance." *Id.*

## V.

We conclude that Long's constitutional and statutory claims challenging TSC's reasons and procedures for placing him on the No Fly List are neither moot nor outside the district court's jurisdiction, so we vacate the district court's dismissal and remand for it to consider those claims in the first instance. To the extent Long also alleges purported inadequacies in the DHS TRIP process, the district court should determine whether Long challenges a final order of the TSA Administrator subject to 49 U.S.C. § 46110. If so, we leave to the district court's discretion whether to transfer that claim to an appropriate court of appeals.

We also hold that Long has alleged a cognizable injury traceable to TSC's action placing him on the Watchlist, namely TSA's effective denial of his TWIC and HME

28

applications.  Accordingly, we vacate the dismissal of his Watchlist claims and remand for the district court to consider in the first instance Defendants' motion to dismiss for failure to state a claim.

*VACATED AND REMANDED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

While I appreciate my colleagues' careful attention to this matter, in what can only be described as a messy area of law, I have some limited disagreements with respect to the majority's standing analysis. As a result, I respectfully dissent from the holding that Long has not sufficiently alleged a concrete injury regarding dissemination of his Watchlist status through the NCIC database. *See* Maj. Op. § III.B.

## I.

Long asserted at least four ongoing harms as a result of the government sharing his watchlist status: (1) the delay and effective denial of his transportation license applications; (2) the Oklahoma City Police Department's repeated traffic stops; (3) the inability to purchase a firearm; (4) and the potential for future traffic stops or detention by foreign or domestic law enforcement. While the majority finds that only the first harm supports standing for any of Long's claims, I would find that the other three harms—at least, as alleged—would similarly confer a concrete and particularized injury for purposes of Article III standing.

## A.

Turning first to the issues of prospective injunctive relief, I disagree entirely with the majority's approach. To obtain injunctive relief, a Plaintiff must allege a likelihood of future injury that is not unduly speculative. Past injury makes future injury more likely to occur, but a complaint must contain specific allegations that such an injury is likely to recur to obtain injunctive relief. *See Kenny v. Wilson*, 885 F.3d 280, 289–90 (4th Cir. 2018). At

the motion to dismiss stage, the allegations must plausibly show a likelihood of future harm. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 212 (4th Cir. 2017); *Carolina Youth Action Proj.; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 778–79 (4th Cir. 2023) (explaining the differing levels of evidence required for standing at successive stages in litigation).

This standard stems most notably from the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In *Lyons*, "the plaintiff sought to enjoin the Los Angeles Police Department's use of chokeholds when an officer faces no threat of deadly force." *Kenny*, 885 F.3d at 289 (describing *Lyons*, 461 U.S. at 98). "The plaintiff had previously been handcuffed and choked by a police officer during a traffic stop, but the court held that '[a]bsent a sufficient likelihood that he will again be wronged in a similar way, [the plaintiff] is no more entitled to an injunction than any other citizen of Los Angeles.'" *Id.* (quoting *Lyons*, 461 U.S. at 111).

The majority uses *Lyons* for the proposition that past exposure to illegal conduct has no bearing on the likelihood of future exposure to that same conduct. But that is not at all what *Lyons* stands for. The plaintiff there sought prospective injunctive relief based *only* on the conduct of a single police officer during a single traffic stop. *Kenny*, 885 F.3d at 289. "In fact, the Court in *Lyons* explained that there would have been an actual controversy if [the plaintiff had 'allege[d] that he would have another encounter with the police' and 'that the City ordered or authorized police officers to act in such manner.'" *Id.* at 290–91 (citing *Lyons*, 461 U.S. at 105–06). Thus, *Lyons* indicated a pleading problem, not a broader preclusion of such a claim for relief.

31

Turning to this case, I reject the majority's characterization of Long's pleadings—Long's allegations with respect to the Oklahoma City Police Department clearly pass muster. To begin, Long alleged repeated stops by police because of the dissemination of his Watchlist status. *See* J.A. 97–103. Despite a stipulation with the Oklahoma City Police Department to end this conduct, Long alleges that these stops have not ceased. J.A. 315–16. Further, Long alleges that these stops are likely to occur in any city in which a similar program of stopping vehicles based on Watchlist status is in place. In my view, it is unclear how Long could have provided more concrete allegations of likely future harm without some sort "magic eight ball" capable of divining the future. *See, e.g.*, *United States v. Ferguson*, 752 F.3d 613, 619 (4th Cir. 2014). Our precedent compels a finding that Long has standing to challenge the allegedly illegal dissemination of Watchlist status through the NCIC.

## B.

I also disagree with the majority's minimization of Long's very real harms to his privacy interests from dissemination of his watchlist status outside of the federal government, regardless of whether the third party takes action on that information. To me, this Court's precedents applying *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), require a different outcome than that reached by the majority.

To begin, the majority does not cite any of this court's precedents applying *Transunion*. As we have previously explained,

> In *TransUnion*, the Supreme Court held that "publication to a third party of a credit report bearing a misleading OFAC alert" concretely injures the subject of the report. That injury bears a close relationship to "the

32

reputational harm associated with the tort of defamation," which is a harm traditionally recognized as providing a basis for a lawsuit in American courts. "Under longstanding American law, a person is injured when a defamatory statement that would subject him to hatred, contempt, or ridicule is published to a third party." And **labelling someone a potential terrorist**, drug trafficker, or serious criminal—as the erroneous OFAC alerts do—certainly qualifies.

*Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 295 (4th Cir. 2024) (Rushing, J.) (quoting TransUnion, 594 U.S. at 431–32) (internal citations omitted, emphasis added).

So, if labeling someone as a terrorist "certainly qualifies" as a concrete injury when disclosed to a third party, why does the majority reject Long's claim here?[*] That is where the majority turns to *Elhady v. Kable*, for the proposition that "disclosure [of Watchlist status] to state or tribal law enforcement agencies does not constitute public disclosure." Maj. Op. at 25–26 (quoting 993 F.3d 208, 225 (4th Cir. 2021)). This is a misreading of *Elhady*.

Just one sentence prior to that cited by the majority, the *Elhady* panel noted our prior holding that disclosure of information to *federal* law enforcement agencies, "to be used for *federal* law enforcement purposes," is not public disclosure to a third party. *Elhady*, 993 F.3d at 225 (emphasis added). The panel then went on, in dicta, to state that this rationale would apply to dissemination to state and local law enforcement agencies. But the *Elhady* panel provided no legal rationale for why that rule should apply outside the federal government, nor was that holding relevant to the disposition of that matter. In my view, it

---

[*] Long also alleges that his Watchlist status is shared with private corporations, such as banks and gun sellers. It is my understanding that there is no dispute that these entities qualify as third-parties.

makes sense that *intra*governmental information sharing would be classified quite differently from *inter*governmental information sharing.  It would be near impossible for agencies to achieve federal law enforcement priorities if agencies could not share information with each other.  However, there is no evidence of coordination between the Oklahoma City Police Department and the federal government in this case.  Moreover, the federal government is a single entity or sovereign, something that cannot be said of state and local agencies.  And the sharing with third parties here has clearly led to very real harms, including repeated, ongoing arrests based on Long's allegedly false label as a terrorist.  As a result, I would decline to follow *Elhady* and instead hold that NCIC dissemination to state and local law enforcement qualifies as public disclosure to a third party.

Based on the above, I would find that allegedly illegal dissemination of Long's Watchlist status to constitute a concrete injury-in-fact, providing a second justification for standing as to his NCIC claims.

## II.

While I agree with nearly all of the majority's holdings in this matter, I cannot join its deviation from this Court's precedents as it pertains to standing.  I fear the broader implications of the majority's efforts to curtail standing for prospective injunctive relief, in contravention of this Court's repeated applications of *Lyons*.  I also find the treatment of the harms to Long's privacy interests to be out of step with this Court's precedents, none of which the majority addresses.  As a result, I respectfully dissent from Section III.B while joining the rest of the opinion in full.

34